**Lenson A. HARGRAVE, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Secretary, Department of Corrections, State of Florida, Respondent-Appellee.**

No. 84–5102.

United States Court of Appeals, Eleventh Circuit.

Nov. 3, 1986.

Rehearing En Banc Granted Jan. 26, 1987.*

---

\* Opinion vacated.

See also 388 So.2d 1021.

Bennett H. Brummer, Public Defender, Elliot H. Scherker, Asst. Public Defender, Miami, Fla., for petitioner-appellant.

Jim Smith, Atty. Gen. of Fla., Carolyn Snurkowski, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, Senior District Judge.

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

TJOFLAT, Circuit Judge:

Petitioner, Lenson A. Hargrave, who was found guilty of first degree murder by a Florida jury and sentenced to death, presents three issues in this appeal from a federal district court's denial of his petition for writ of habeas corpus: (1) whether petitioner's eighth amendment right against cruel and unusual punishment was violated (a) because the jury was not instructed that it could consider nonstatutory mitigating factors when rendering an advisory sentence, (b) because petitioner's counsel believed that he was limited to the presentation of statutory mitigating evidence at the sentencing hearing, and (c) because the sentencing judge and the Supreme Court of Florida did not fully consider nonstatutory mitigating circumstances; (2) whether the State's introduction at the trial's sentencing phase of the testimony of a psychologist appointed by the court at petitioner's request violated petitioner's fifth amendment right against compelled self-incrimination and sixth amendment right to counsel, even though petitioner did not contemporaneously object; and (3) whether Fla. Stat. 921.141(5)(h) (1975), which defines a killing that is "especially heinous, atrocious, or cruel," as an aggravating circumstance, was applied in an unconstitutionally vague manner in violation of the eighth amendment. We conclude that the district court properly disposed of each of these issues and thus affirm.

## I.

### A.

Sometime in mid-May 1974, petitioner and his friend, Lawrence Karge, planned the robbery of a U-Tote-M convenience store in Miami, Florida.[1] Karge was a former employee of the store and was familiar with the store's alarm system. In the early evening of May 17, petitioner entered the store alone. He approached the clerk, Joseph Jones, who was the only other person in the store. Petitioner pulled out a gun and told Jones it was a holdup. Jones raised his hands, and petitioner told him to hand over the money in the cash register. Jones tried to comply but could not, because the cash register was jammed. Petitioner stepped backward and told Jones, "Open it up." Jones replied "I can't. It's jammed. I can't." Then petitioner fired two shots at Jones; one missed, but the other hit Jones in the chest. Jones gasped and fell backwards to the floor. Petitioner walked behind the counter and tried, unsuccessfully, to open the register. As petitioner was walking back toward the front of the counter, a man entered the store and asked petitioner if the store carried pickled pigs' feet. Petitioner replied, "No, we don't. We're out of them right now." After the man walked out of the store, got into his car, and drove off, petitioner walked around to the front of the counter and shot Jones in the head.

Petitioner then left the store and walked to the parking lot of a nearby bar to wait for Karge, who arrived about two minutes later and drove petitioner home. After eating dinner and changing his clothes, petitioner left for his job as a night security guard for a shopping center.

About seven months later, petitioner was arrested for the murder of Joseph Jones. At the stationhouse following his arrest, petitioner waived his *Miranda* rights and signed a statement, confessing to the killing and identifying the location of the murder weapon.

### B.

Before trial, defense counsel informed the court that he doubted petitioner's competency to stand trial and his sanity at the time of the offense and moved the court for the appointment of one or more experts to examine petitioner.[2] The court appointed three experts, two psychiatrists and a psychologist, all of whom determined that petitioner was competent to stand trial and

---

1. These facts are derived in large part from petitioner's post-arrest confession to the police, which was read into the record at his trial.

2. *See* Fla.R.Crim.P. 3.210 (1975).

had been sane at the time of the Jones murder.[3]

Petitioner's trial began on July 10, 1975.[4] The guilt/innocence phase of the trial took five days and resulted in a jury verdict of first degree murder.[5] The sentencing phase of the trial began shortly after the jury returned its verdict and was completed the same day. The State called three witnesses: the court-appointed psychologist and two lay witnesses. The psychologist described petitioner as a sociopath who had "a great deal of difficulty conforming to and adjusting to the mores or demands of society." He said that petitioner was insecure, apprehensive, and hostile. The psychologist also said that petitioner, who was nineteen at the time of the examination, had "a mental age of sixteen to seventeen" and had a history of using drugs, mostly marijuana. The two lay witnesses testified that, prior to petitioner's arrest, he said that he had killed someone before and it would not bother him to kill again. The defense called one of the court-appointed psychiatrists and petitioner's mother. The psychiatrist testified that petitioner had an "anti-social personality," acted impulsively, and could easily be used by other persons. Petitioner's mother stated that petitioner had been under Karge's influence for a long time. The jury recommended the imposition of the death penalty.

On July 18, 1975, the trial court convened a hearing to sentence petitioner. The court heard testimony from petitioner's mother and grandmother (who corroborated the mother's trial testimony), petitioner's allocution, and argument from counsel for the State and petitioner. The court found that

3. Apparently as a result of the experts' determinations, petitioner chose not to raise an insanity defense.

4. Karge was not tried with petitioner; he entered a guilty plea to second-degree murder and was sentenced to 20 years imprisonment. Karge did not testify at petitioner's trial.

5. In Florida, if a defendant is found guilty of first-degree murder and the state seeks the death penalty, a second, sentencing proceeding is conducted during which the state and the defense present evidence that either militates in favor of imposing the death penalty (termed aggravating circumstances), or that militates against imposing that penalty (termed mitigating circumstances). See Fla.Stat. § 921.141(1)–(3) (1975). Weighing the evidence presented in aggravation and mitigation, the jury arrives at a sentencing recommendation that is then reviewed by the trial court. Fla.Stat. § 921.141(3) & (4) (1975).

The statutory aggravating circumstances in effect at the time of petitioner's trial, found in Fla.Stat. § 921.141(5), (1975), were:

(5) AGGRAVATING CIRCUMSTANCES.—Aggravating circumstances shall be limited to the following:

(a) The capital felony was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery....

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital felony was committed for pecuniary gain.

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital felony was especially heinous, atrocious, or cruel.

The statutory mitigating circumstances in effect at the time of petitioner's trial, found in Fla.Stat. § 921.141(6), (1975), were:

(6) MITIGATING CIRCUMSTANCES.—Mitigating circumstances shall be the following:

(a) The defendant has no significant history of prior criminal activity.

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

four aggravating circumstances attended the Jones murder: (1) the murder was committed while the petitioner was attempting to commit a robbery; (2) the murder was committed "for the purpose of avoiding or preventing a lawful arrest"; (3) the murder was committed for pecuniary gain; and (4) the murder was "especially heinous, atrocious or cruel, in that, after initially shooting the victim and while the victim lay helplessly bleeding on the floor, the [petitioner] deliberately leaned over the counter and shot the victim in the head." The court found two mitigating circumstances: (1) petitioner had "no significant history of criminal activity"; and (2) petitioner's age—eighteen years. The court balanced the factors and agreed with the jury that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the court imposed the death penalty.

Petitioner unsuccessfully appealed his conviction to the Supreme Court of Florida.[6] *Hargrave v. State*, 366 So.2d 1 (Fla. 1978) (per curiam), *cert. denied*, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). He then filed a motion in the trial court to vacate the judgment and sentence under Fla.R.Crim.P. 3.850 (1977).[7] This motion was denied, and the Supreme Court of Florida affirmed the denial. *Hargrave v. State*, 396 So.2d 1127 (Fla.1981) (per curiam). Petitioner filed a second post-conviction motion in the trial court,[8] which also was denied. The Supreme Court of Florida affirmed the denial. *Hargrave v. State*, 427 So.2d 713 (Fla.1983). Having exhausted his state remedies, petitioner filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Florida. The district court, following a nonevidentiary hearing, denied his petition. He then took this appeal.

## II.

Petitioner claims that he was denied his eighth amendment right against cruel and unusual punishment because certain mitigating evidence was not considered by the

6. Fla.Stat. § 921.141(4) (1975) provided for automatic direct review of a judgment of conviction and sentence of death to the Supreme Court of Florida. On direct appeal, petitioner raised, among others, the third claim that he raises here; he contended that the trial court applied Fla.Stat. § 921.141(5)(h), which defines a killing that is "especially heinous, atrocious, or cruel" as an aggravating circumstance, in an overbroad and vague manner. Although he did not explicitly claim that this application violated the eighth amendment to the United States Constitution, his contention that "the commission of the homicide in this case in no way sets the crime apart from the norm of capital felonies" clearly posed that constitutional argument.

In a "supplemental brief" filed after oral argument but shortly before the Supreme Court of Florida issued its opinion, petitioner raised the second and third components of the first claim he presents here. *See infra* text accompanying note 9. In that document, petitioner claimed that his eighth amendment rights had been violated because "the trial court and counsel for the state and defense incorrectly assumed [at his sentencing hearing] that mitigating circumstances were limited to those in the statute." He asked that the case be remanded for a new sentencing hearing. The supreme court affirmed the trial court's conviction and sentence, but did not acknowledge or address that claim in its published opinion. *See Hargrave v. State*, 366 So.2d 1 (Fla.1978) (per curiam), *cert. de-*

*nied*, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). The supreme court later summarily denied motions by petitioner, to withdraw its opinion and for rehearing, that requested the court to reconsider its disposition of this claim.

Petitioner did not raise his second claim before us—that his fifth and sixth amendment rights were violated by the introduction of the testimony of the state's psychologist—until his first collateral attack under Fla.R.Crim.P. 3.850 (1977). *See infra* note 7.

7. Petitioner raised his second claim for the first time in this Rule 3.850 motion. *See supra* note 6. The trial court dismissed the claim on the ground that it should have been raised on direct appeal and therefore did not consider its merits. The Supreme Court of Florida affirmed with a published opinion that similarly declined to reach the merits. *Hargrave v. State*, 396 So.2d 1127 (Fla.1981) (per curiam).

8. In this motion, petitioner again raised the second claim he presents here, *see supra* notes 6 & 7, following the United States Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). This time the trial court reached the merits of petitioner's *Estelle* claim, but denied petitioner relief. The Supreme Court of Florida affirmed. In its opinion, the court held that *Estelle* was inapposite. *See Hargrave v. State*, 427 So.2d 713 (Fla.1983).

jury, the trial court, or the Supreme Court of Florida. There are several components to petitioner's claim. First, petitioner argues that although his counsel did not offer any nonstatutory mitigating evidence, to the extent that such evidence was elicited at trial—for example, petitioner's steady employment, below average intelligence, and history of drug use—the court prevented the jury from considering that evidence because of its limiting instructions.[9] Second, he contends that his trial counsel believed that the presentation of mitigating evidence at the sentencing phase of the trial was limited to evidence of statutory mitigating circumstances. Finally, petitioner contends that the trial court, when sentencing petitioner, considered only statutory mitigating circumstances and that both the trial court and the state supreme court did not accord any mitigatory weight to evidence of petitioner's below-average intelligence, simply because they found that the statutory requirement of "substantial [mental] impairment" was not met. Each component of petitioner's claim is rooted in *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality), which held that the eighth and fourteenth amendments require that a sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Footnote omitted).

Before we can address a habeas petitioner's federal constitutional claim, we must first determine if that claim is properly before us. We begin by examining the procedural history of petitioner's jury instruction argument.

### A.

Petitioner did not object to the court's jury instructions on mitigating cir-

cumstances at trial.[10] Nor did petitioner object to those instructions on direct appeal to the Supreme Court of Florida. No objection was made, in fact, until after the supreme court issued its opinion affirming petitioner's conviction and sentence; the petitioner raised the issue for the first time in a petition for rehearing.

At the time of petitioner's appeal, Rule 3.14(b) of the Florida Appellate Rules (1962) governed the contents of a petition for rehearing: "The petition for rehearing shall not assume a new ground or position from that taken in the original argument or briefs upon which the cause was submitted...." Thus, an argument could not have been raised for the first time in a petition for rehearing. *See Delmonico v. State*, 155 So.2d 368 (Fla.1963) (initial presentation of matter on rehearing was improper) (footnote omitted); *Leslie Bros. v. Roope*, 108 Fla. 289, 148 So. 212 (1933) (supreme court will not, on petition for rehearing after affirmance, reopen case to permit presentation of different theory from that adopted below); *Price Wise Buying Group v. Nuzum*, 343 So.2d 115, 117 (Fla.Dist.Ct.App.1977) (appellate court would not consider an issue raised for first time in petition for rehearing). In this case, the petition for rehearing contained arguments that had been briefed and addressed by the supreme court—for example, whether the trial court erred in sentencing the defendant without the benefit of a presentence investigation report. The petition also contained an argument that had not been briefed or decided by the supreme court—whether the jury was erroneously instructed about mitigating circumstances. Thus, claims that were both procedurally appropriate and inappropriate were raised in the petition.

The supreme court summarily denied the petition for rehearing. We read that denial

---

**9.** At the beginning of the trial's penalty phase, the court instructed the jury on aggravating circumstances. Then, after stating "the mitigating circumstances which you may consider," the court listed the seven mitigating circumstances of Fla.Stat. § 921.141(6) (1975). *See supra* note 5.

**10.** Rule 3.390(d) of the Florida Rules of Criminal Procedure (1975) provided that to preserve the issue for appellate review, a jury instruction must be objected to "before the jury retires to consider its verdict."

to mean that the supreme court considered the merits of the claims that were properly before it and, in effect, dismissed the jury instruction claim because petitioner failed to comply with the governing rule of appellate procedure; consequently, the court never reached the merits of his jury instruction claim. In essence, petitioner sought another round of appellate review, and the Supreme Court of Florida properly declined to grant that unsanctioned opportunity.[11] We therefore conclude that petitioner committed state procedural default and has foreclosed his right to federal review of his jury instruction claim, unless he can show cause for the default and actual prejudice resulting from the alleged constitutional violation. *See Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

### B.

The second and third components of petitioner's mitigating evidence argument—his trial counsel incorrectly assumed that mitigating circumstances were limited to those listed in the statute and the trial court, in sentencing petitioner, considered only statutory mitigating evidence—were first raised after briefs were filed and oral argument was heard on direct appeal before the Supreme Court of Florida. Petitioner made those arguments for the first time more than a year and one-half after oral argument when he filed a supplemental brief, asking for a new sentencing hearing in order to present nonstatutory mitigating evidence. Ten days after petitioner filed his supplemental brief, the supreme court issued an opinion affirming petitioner's

conviction and sentence; the arguments made in petitioner's supplemental brief were neither acknowledged nor addressed.

We cannot presume that the supreme court's silence indicates that it reached the merits of those arguments, because the Florida Appellate Rules made no provision for a "supplemental brief." The rule in force during petitioner's appeal provided for an appellant's main brief, an appellee's brief, and an appellant's reply brief, but for no other briefs or appendices "except by special order of the appellate court." Fla. App.Rules 3.7(d) (1962). Moreover, that rule states that "[s]uch assignments of error as are not argued in the briefs will be deemed abandoned and may not be argued orally." Fla.App.Rules 3.7(i) (1962). In short, the Florida Appellate Rules made no provision for supplemental briefing of abandoned claims.

In this case, petitioner wished to raise certain claims that he never addressed in his main brief[12] and never presented at oral argument. The Supreme Court of Florida did not issue a special order that would have allowed him to raise those claims. Petitioner's "supplemental brief" was thus a nullity.

After the supreme court issued its opinion, petitioner again raised his mitigating evidence arguments in his petition for rehearing. For the same reasons given in our discussion of the jury instruction, we find that there was procedural default as to petitioner's contentions that his trial counsel incorrectly assumed that mitigating circumstances were limited to those listed in the statute and that the trial court (and thus the supreme court) considered only

---

**11.** Petitioner raised his jury instruction claim again in a motion to vacate sentence under Fla.R.Crim.P. 3.850 (1977), filed with the trial court. The trial court did not reach the merits of the claim. It found the motion "insufficient as a matter of law," because "it present[ed] grounds that were actually litigated on direct appeal or were otherwise inappropriate for a motion to vacate." The Supreme Court of Florida affirmed the trial court's denial of petition-

er's motion to vacate sentence without reaching the merits of petitioner's jury instruction claim: "The trial court found, and we so hold, that the issues raised by appellant either were or could have been raised on direct appeal, or they involve changes in decisional law not cognizable in a 3.850 motion." *Hargrave,* 396 So.2d at 1127–28 (citations omitted).

**12.** It appears from the record that petitioner did not file a reply brief on direct appeal.

statutory mitigating evidence.[13] Because we have concluded that all three components of petitioner's mitigating evidence argument were procedurally barred in the state proceedings, we must next determine if there is "cause and prejudice" to advance petitioner's claim in this habeas corpus proceeding.

### C.

Petitioner argues in his brief that he was excused from objecting at trial and on direct appeal because the law at that time indicated that only statutory mitigating circumstances could be considered,[14] and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality), upon which his constitutional claim is based, was decided more than three years after his trial.[15] In *Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984), the Supreme Court held that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." To determine whether the state of the law at the time of trial and appeal offered a reasonable basis upon which to make a constitutional challenge, the Court identified

> three situations in which a "new" constitutional rule, representing "a clear break with the past," might emerge from this Court. First, a decision of this Court

may explicitly overrule one of our precedents. Second, a decision may "overtur[n] a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." And, finally, a decision may "disapprov[e] a practice this Court arguably has sanctioned in prior cases."

*Id.* at 17, 104 S.Ct. at 2911 (citations omitted). None of those situations identified by the Court cover the case before us. *Lockett* did not overrule Supreme Court precedent and was not contrary to a near-unanimous body of lower court authority. And *Lockett* did not disapprove a practice that the Supreme Court had arguably sanctioned in earlier cases. Rather, the rule in *Lockett* was the product of evolving capital punishment law and "followed from the earlier decisions of the [Supreme] Court and from the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982).

■ Moreover, at the time of petitioner's trial in 1975, the ambiguous wording of Florida's statute left open the question of whether under Florida law the presentation of mitigating circumstances was limited to those factors enumerated in the statute. *Proffitt v. Wainwright*, 685 F.2d 1227, 1238 (11th Cir.1982), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).[16]

---

**13.** Petitioner later raised the arguments found in his supplemental brief in a motion to vacate sentence under Fla.R.Crim.P. 3.850 (1977) filed with the Florida trial court. Neither the trial court nor the Supreme Court of Florida addressed the merits of those claims. *See supra* note 11.

**14.** Petitioner, who was tried in 1975, cites a 1973 decision of the Supreme Court of Florida that said a finding of one aggravating circumstance renders a death sentence presumptively appropriate unless it is overridden "by one or more of the mitigating circumstances provided" in the statute. *State v. Dixon*, 283 So.2d 1, 8 (Fla.1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Petitioner also cites *Cooper v. State*, 336 So.2d 1133 (Fla.1976) (per curiam), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977), which was decided

in 1976, *after* petitioner's trial and *after* petitioner's main brief was filed in his direct appeal. In *Cooper* is the statement that the Florida "Legislature chose to list the mitigating circumstances which it judged to be reliable for determining the appropriateness of a death penalty for 'the most aggravated and unmitigated of serious crimes,' and we are not free to expand the list." *Cooper*, 336 So.2d at 1139 (footnote omitted).

**15.** This circuit has held that *Lockett* is to have retroactive effect. *Songer v. Wainwright*, 769 F.2d 1488, 1489 (11th Cir.1985) (per curiam) (en banc).

**16.** The statute prefaced the list of aggravating circumstances with the statement that they "shall be limited to the following: ..." Fla.Stat. § 921.141(5) (1975); *see supra* note 5. The list of mitigating circumstances was preceded by the

And although the Supreme Court of Florida had suggested that mitigating circumstances were limited to those found in the statute,[17] it did not address the scope of admissible evidence until after it issued its opinion in petitioner's direct appeal.[18] In light of the evolving nature of capital sentencing law due to the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and the uncertain meaning attached to Florida's new capital sentencing statute,[19] we find no "cause" for petitioner's failure to object at trial or on direct appeal. Clearly there was a reasonable basis in 1975 upon which petitioner could have made the constitutional challenge he wishes to make today. We note further that, even if petitioner's perception of state law had been reasonable, the "futility of presenting an objection to the state courts cannot alone constitute cause for failure to object at trial." *Engle v. Isaac,* 456 U.S. 107, 130, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982); *see also Antone v. Strickland,* 706 F.2d 1534, 1537 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983). Because petitioner has failed to show cause for the procedural default of his *Lockett* claim, we are barred by *Wainwright v. Sykes* from considering the merits of that claim.[20]

### III.

Petitioner next claims that the State, contrary to the fifth and fourteenth amendments, violated his right against self-incrimination. Petitioner argues that testimony by Dr. Robert W. Sylvester during the penalty phase of the trial violated his rights under *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), because Dr. Sylvester's testimony was based upon a competency examination during which petitioner received no *Miranda* warnings.[21] We find *Smith* distinguishable and conclude that its underlying rationale does not apply in this case.

In *Smith,* the trial judge ordered *sua sponte* that the defendant be given a psychiatric examination to determine his competency to stand trial. The defendant was found to be competent and was subsequently convicted of a capital crime. At the penalty stage of his bifurcated trial, the State offered the testimony of the court-appointed psychiatrist who had examined the defendant. The psychiatrist testified that, based on the information he collected during the competency interview, he believed that the defendant would always be dangerous. Relying on this testimony, the jury answered special interrogatories in a manner that made the death penalty mandatory. *See Smith,* 451 U.S. at 456–60, 101 S.Ct. at 1870–71.

The Supreme Court granted certiorari on Smith's petition for habeas corpus and held that the State's use of the doctor's testimo-

statement that "[m]itigating circumstances shall be the following: ..." Fla.Stat. § 921.141(6) (1975); *see supra* note 5.

**17.** *See supra* note 14.

**18.** The Supreme Court of Florida issued its opinion on petitioner's direct appeal on June 30, 1978. It was not until more than two months later, on September 7, 1978, that the supreme court squarely addressed the scope of admissible mitigating evidence, holding that its construction of the statute "has been that all relevant circumstances may be considered in mitigation, and that the factors listed in the statute merely indicate the principal factors to be considered." *Songer v. State,* 365 So.2d 696, 700 (Fla.1978) (per curiam), *cert. denied,* 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979).

**19.** Florida was the first state in the wake of *Furman* to redraft its death penalty statute, just two years before petitioner's trial.

**20.** The test enunciated by *Sykes* is two-pronged: a habeas petitioner must show both cause and prejudice for his procedural default in the state courts. Because the petitioner in this case did not show cause, we need not address the issue of prejudice.

**21.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner also asserts that his sixth and fourteenth amendment right to counsel was violated because the State failed to inform petitioner's counsel that statements made by petitioner to Dr. Sylvester might subsequently be used by the State. We find no merit to this claim, in light of our conclusion regarding petitioner's self-incrimination theory.

ny had violated the fifth, sixth, and fourteenth amendments. The Court found the situation at issue to be analogous to that in *Miranda* and thus ruled that Smith should have received *Miranda* warnings before speaking with the psychiatrist. *Id.* at 466–69, 101 S.Ct. at 1875–76. The Court further ruled that, under the sixth and fourteenth amendments, Smith's counsel should have been informed that the State could use the results of the examination in the penalty phase of the defendant's trial. *Id.* at 469–72, 101 S.Ct. at 1876–77.

After *Smith*, in *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981),[22] the former Fifth Circuit held that *Smith* was to be applied retroactively. The court further held that a defendant did not waive his right to *Miranda* warnings merely because he initiated the request for a competency hearing.

■ The *Battie* decision, which is binding upon us, makes it irrelevant that it was petitioner who requested the competency examination conducted by Dr. Sylvester. Nevertheless, we find significant distinctions between the principle at issue in the present case and that in *Smith*. Upon reflection, we find that there is no constitutional error when the State introduces psychiatric or psychological evidence during the penalty stage of a bifurcated trial to counter other psychiatric or psychological evidence the defendant has announced he will proffer. *See Smith*, 451 U.S. at 472, 101 S.Ct. at 1878 ("[A] different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase.").

In *Smith*, the Court did not assert that the psychiatrist's testimony was inadmissible because it was based on the defendant's involuntary or coerced statements.[23] Instead, the Court was concerned more with the element of fairness implicit in the fifth amendment, which prohibits a defendant "from being made the 'deluded instrument' of his own execution." *Smith*, 451 U.S. at 462, 101 S.Ct. at 1873. In the Court's view, the State clearly violated this fairness element when it introduced psychiatric testimony based on the defendant's own statements, given that the defendant "introduced no psychiatric evidence, nor had he indicated that he might do so." *Id.* at 466, 101 S.Ct. at 1874.

In the case before us, however, we are not faced with a situation where the State, even unintentionally, deceived petitioner. At the beginning of the penalty phase, petitioner stated that he intended to call a psychiatrist to testify on his behalf, presumably to establish mitigating circumstances. When the trial judge asked whether either side planned to call Dr. Jarrett, and the State indicated that it did not, petitioner's counsel said "[t]hen the Defendant will." [24] Thus, before Dr. Sylvester began testifying, the State knew that

**22.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**23.** The *Smith* Court explicitly stated that "no Fifth Amendment issue would have arisen" had the examining psychiatrist's testimony been used solely for a determination of the defendant's competency. *Smith*, 451 U.S. at 465, 101 S.Ct. at 1874. Thus, that decision clearly cannot be read as ordering the exclusion of a defendant's statement to a psychiatrist, given in the absence of *Miranda* warnings, on the ground that a psychiatric examination is inherently coercive or the statements a defendant makes during the course of it are inherently involuntary. Unlike the interrogation methods the Supreme Court barred in *Miranda*, the case before us lacks the coercive atmosphere and potentially unreliable confession that *Miranda* presented. This difference, and the *Smith* Court's emphasis on the *use* of the psychiatrist's testimony rather than on the examination itself, further supports our conclusion that the fairness concerns in *Smith* are lacking in the facts of the present case.

**24.** The defense actually called Dr. Corwin, not Dr. Jarrett, to testify. Nothing in the trial transcript indicates that the reference to Dr. Jarrett was anything more than confusion among the trial participants regarding Dr. Corwin's name. Both the State and defense had exchanged witness lists before the trial began, lists that included the names of the experts who had examined petitioner. Petitioner does not claim that the State "sandbagged" him by not revealing its intention to call Dr. Sylvester to testify.

the defense intended to present favorable psychiatric evidence.[25] Furthermore, petitioner made no contemporaneous objection to Dr. Sylvester's testimony.[26] This indicates to us that petitioner had not changed his mind about presenting psychiatric evidence to the jury and thus cannot claim that the State's strategy to counter his argument before he made it, rather than in rebuttal, violated his rights.

■ To us, petitioner's announced intention to present psychiatric testimony in his favor vitiated the *Smith* Court's concerns. There, the defendant was suddenly faced with the use of self-incriminating testimony on an issue he had never raised. In contrast, petitioner in the present case chose to bring psychiatric evidence to the jury's attention and cannot now complain because the State attempted to counter his argument with evidence of its own. Just as a defendant cannot take the stand and lie, secure in the knowledge that his prior confession will be excluded solely because he had not received *Miranda* warnings, *see Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), we find nothing in the Constitution that prohibits the State from introducing psychological opinions based on statements a defendant has given in the absence of *Miranda* warnings when the defendant himself plans to make his mental abilities an issue.

**25.** Petitioner does not contend that the State violated his rights merely by presenting its psychological witness before the defense did the same. Petitioner might have objected to the State's failure to adhere to the traditional order of proof, but we need not decide whether such an objection would be meritorious in the context of his *Smith* claim.

**26.** Despite petitioner's failure to object to Dr. Sylvester's testimony, the Florida courts considered his claim on the merits in a collateral attack. *See supra* note 8. We are thus authorized to consider petitioner's constitutional claim. We note, however, that not only did petitioner's counsel not object to Dr. Sylvester's testimony, he also made extensive use of it when he urged the jury to show leniency in light of petitioner's mental problems. Petitioner's counsel relied much more on Dr. Sylvester's testimony than on that given by the psychiatrist

## IV.

We come to petitioner's final claim. Petitioner claims that Fla.Stat. § 921.141(5)(h) (1975), which defines a killing that is "especially heinous, atrocious, or cruel" as an aggravating circumstance, was applied by the trial court and the Supreme Court of Florida in an unconstitutionally vague and overbroad manner. Specifically, petitioner contends that every stage of the state court proceedings was infected by this vague and overbroad application of section (5)(h), from the inadequate jury instruction, to the trial court's finding, to the supreme court's review of that finding. We disagree.[27]

At the beginning of the sentencing proceeding, the state trial court instructed the jury that an aggravating circumstance for its consideration was whether "the capital felony was especially heinous, atrocious, or cruel." The court continued: "heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile, and cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others." The jury returned a sentencing verdict of death. Because it submitted no written or oral findings, we have no way of knowing whether the jury found the aggravating circumstance under section (5)(h) applicable in this case.

who testified for the defense, making this case similar to *Witt v. Wainwright*, 714 F.2d 1069 (11th Cir.1983), *rev'd on other grounds*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), where "[t]estimony ... clearly indicates that petitioner would have called the psychiatrist to testify during the sentencing phase of his trial had the state failed to do so." 714 F.2d at 1076–80.

**27.** Because we do not find that section (5)(h) was applied in an unconstitutionally vague or overbroad manner we need not reach the question whether, even if it were unconstitutionally vague as applied here, the imposition of the death penalty was nevertheless constitutional given the existence of at least one remaining aggravating circumstance and an adequately conducted proportionality review. *See Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2750, 77 L.Ed.2d 235 (1983).

The trial court, however, in its findings of fact, specifically found section (5)(h) applicable to the killing: "[T]he capital felony was especially heinous, atrocious or cruel, in that, after initially shooting the victim and while the victim lay helplessly bleeding on the floor, the defendant deliberately leaned over the counter and shot the victim in the head."

Recognizing that its review of trial court findings in death penalty cases "supplies the channeled discretion and deliberation necessary to avert the constitutional deficiencies condemned in *Furman v. Georgia*," *Hargrave v. State*, 366 So.2d 1, 4–5 (Fla.1978) (per curiam) (citing *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)), *cert. denied*, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979), the Supreme Court of Florida began by restating the trial court's findings. The supreme court then added: "In more common terms, the [petitioner] in a calculated fashion 'executed' the victim to avoid later identification." *Hargrave*, 366 So.2d at 5.[28] The court also noted the testimony of two people "who stated that [petitioner] had told each of them that he had killed someone before, and it would not bother him to kill again." *Hargrave*, 366 So.2d at 5. The supreme court, affirming the trial court's finding, concluded that "[t]he sum of all this evidence justifies a finding that the appellant's act of firing the third shot into the head of the victim was 'extremely wicked or shockingly evil.'" *Id.* (citations omitted).

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court struck down sentencing procedures that created a substantial risk that the death penalty would be inflicted in an arbitrary and capricious manner. A capital sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (quoting *Furman*, 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring)). Consequently, the standards that a state enacts to channel the sentencer's discretion must be "clear and objective," *Gregg*, 428 U.S. at 198, 96 S.Ct. at 2936, (quoting *Coley v. State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974)), and "make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Thus, the Court has held that a finding that a killing was "outrageously or wantonly vile, horrible or inhuman," used as a basis for implementing the death penalty, violated the eighth amendment because that standard, standing alone, in no way acted as a "restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980).

Petitioner does not contend that section (5)(h) is unconstitutional on its face. In *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (plurality), the Supreme Court stated that section (5)(h) must be considered in light of the Supreme Court of Florida's construction of that section. Because Florida's high court had previously construed section (5)(h) as applying only to killings that were "'especially' heinous, atrocious or cruel" in that they involved a "conscienceless or pitiless crime which is unnecessarily torturous to the victim," *id.* (quoting *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975); *State v. Dixon*, 283 So.2d 1, 9 (Fla.1973), *cert. denied*,

---

**28.** A short colloquy from the petitioner's post-arrest statement to police is instructive on this point:

DETECTIVE MAJOR: "When you shot the clerk the third time, did you intend to kill him?"
THE DEFENDANT: "Yes, I did."
DETECTIVE MAJOR: "Why did you want to kill the clerk?"

THE DEFENDANT: "Because I was scared, and I was aggravated."
DETECTIVE MAJOR: "Why were you scared?"
THE DEFENDANT: "I was afraid I was going to get caught."
*Hargrave*, 366 So.2d at 5.

416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)), the Court found that section (5)(h) sufficiently channeled a sentencer's application of that circumstance. What petitioner does contend, rather, is that, because neither the trial court nor the Supreme Court of Florida employed a sufficiently narrow construction of section (5)(h), the section was applied to him in an unconstitutionally vague manner.

In *Proffitt v. Wainwright*, 685 F.2d 1227, 1263 (11th Cir.1982), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983), this court was faced with an identical claim: "whether the construction of the [section 5(h)] aggravating factor evinced by the trial court's application of it to the facts ... comports with the eighth amendment requirement that death sentences be based on clear, detailed, and rationally reviewable standards." (Citation omitted.) We began by noting, as the Supreme Court had, that Florida's high court accorded a limited interpretation to "heinous, atrocious, or cruel" by requiring that the "horror of the murder be accompanied by such additional acts as to set the crime apart from the norm." *Id.* (quoting *Dixon*, 283 So.2d at 9). We further noted that one set of "additional acts" identified by the Supreme Court of Florida are those acts that make the murder "conscienceless or pitiless" because they are "unnecessarily torturous to the victim." *Proffitt*, 685 F.2d at 1263 (citations omitted). We concluded that the trial court had not employed a sufficiently narrow construction of section (5)(h). The trial court had concluded simply that the murder—resulting from a single knife stab to the victim's chest—was especially heinous, atrocious, or cruel; it did not state that the murder was torturous and did not identify the facts upon which it had relied. And because the Supreme Court of Florida's decision affirming the sentence did not indicate that it even considered the propriety of applying section (5)(h) to the facts, we concluded that its "review 'in no

way cured' the exercise of 'uncontrolled discretion' by the trial judge." *Id.* at 1265 (quoting *Godfrey v. Georgia*, 446 U.S. 420, 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980)). Finally, our independent examination of the facts in *Proffitt* led us to conclude that the murder was not "heinous, atrocious, or cruel" in light of the interpretation given that aggravating circumstance by the Supreme Court of Florida.[29]

A claim similar to the one presented here and in *Proffitt* was presented to the Supreme Court in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). There, the defendant was convicted of killing his wife and his mother-in-law by shooting each in the head with a shotgun. The sentencing jury found that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 422, 100 S.Ct. at 1762 (plurality). A plurality of the Court found that the application of this aggravating circumstance to the facts in *Godfrey* violated petitioner's eighth amendment right: not only had the Supreme Court of Georgia, when reviewing the case, not employed the limitations that it had previously held applicable to that aggravating circumstance—that the killing involve either aggravated battery or torture—but there was no way to distinguish that case from the many in which the death penalty was not imposed. *Id.* at 433, 100 S.Ct. at 1767.

In sum, the state reviewing courts in both *Proffitt* and *Godfrey* failed to give any explanation or set forth any facts upon which the courts justified their findings of the particular aggravating circumstance under review. Moreover, upon an independent examination of the record, neither this circuit in *Proffitt* nor the Supreme Court in *Godfrey* could distinguish the facts in the case before it from the many in which the state courts had not found the particular aggravating circumstance to apply. With

---

29. The only physical act perpetrated on the victim in *Proffitt* was a single knife stab to the chest. We cited several cases having similar facts in which the Supreme Court of Florida had reversed the finding of a section (5)(h) aggravating circumstance. *See Proffitt*, 685 F.2d at 1264.

this precedent in mind, we turn to the facts of the case before us.

In contrast to the courts in *Proffitt* and *Godfrey*, the trial court here identified the facts forming the basis of its finding that the murder was "especially heinous, atrocious, or cruel": the petitioner deliberately leaned over the counter and shot the store clerk while he lay bleeding, helplessly, on the floor. The Supreme Court of Florida upheld the trial court's finding, describing the killing as an execution committed to avoid later identification and noted the petitioner's statement that it would not bother him to kill again, a statement presumably relevant to his future dangerousness and his feelings of remorse. Our task is to determine whether these factors sufficiently narrowed section (5)(h) so as to comport with the requirement that "death sentences be based on clear, detailed, and rationally reviewable standards." *Proffitt*, 685 F.2d at 1263 (citing *Godfrey*, 446 U.S. at 427–33, 100 S.Ct. at 1764–67).

Just as the Supreme Court of Florida has held the presence of torturous acts to limit sufficiently the meaning of "heinous, atrocious, or cruel," *see Proffitt*, 685 F.2d at 1263, it also has found that acts making a murder "execution-style" appropriately fall into that category.[30] An execution-style murder, as defined by the Florida courts, is typically one in which the defendant, without provocation, first renders his victim helpless—for example, by wounding the victim, tying the victim's hands, or ordering the victim to the floor—and then shoots the victim in the head at close range, often to eliminate the victim as a future witness. *Compare, e.g., Ferguson v. State*, 417 So.2d 639, 646 (Fla.1982) ((5)(h) proper when defendant shot victims in head while they were lying on floor with their hands tied behind their backs); *Jones v. State*, 411 So.2d 165, 169 (Fla.) (per curiam) ((5)(h)

proper when defendant shot victim in back of head at point-blank range as victim lay prone on floor pleading to be saved), *cert. denied*, 459 U.S. 891, 103 S.Ct. 189, 74 L.Ed.2d 153 (1982); *Palmes v. State*, 397 So.2d 648, 650, 657 (Fla.) (per curiam) ((5)(h) proper when victim bound and gagged at time of killing), *cert. denied*, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); *Ruffin v. State*, 397 So.2d 277, 282 (Fla.) (per curiam) ((5)(h) proper where victim "shot in the back of the head while lying face down"), *cert. denied*, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981); *Clark v. State*, 379 So.2d 97, 100, 104 (Fla.1979) (per curiam) ((5)(h) proper where victim's hands were tied behind his back with wire and defendant "marched the victim into the bushes, made him kneel down, and shot him twice in the back of the head"), *cert. denied*, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981); *Ford v. State*, 374 So.2d 496, 502 n. 1 (Fla.1979) (per curiam) ((5)(h) proper because victim had been rendered helpless by the time the final, fatal shot was fired), *cert. denied*, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980); *Sullivan v. State*, 303 So.2d 632, 637–38 (Fla. 1974) ((5)(h) proper when defendant struck victim twice in head with tire iron, then shot him in back of head with shotgun, reloaded and shot again), *cert. denied*, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976) *with, e.g., Middleton v. State*, 426 So.2d 548, 552 (Fla.1982) (per curiam) ((5)(h) improper where victim was killed instantaneously and had no awareness that he was about to be shot), *cert. denied*, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1413 (1983); *Armstrong v. State*, 399 So.2d 953, 962–63 (Fla.1981) (per curiam) ((5)(h) improper when no evidence that victims were helpless when killed, death occurred relatively instantaneously, and proof was insufficient that motivation for murders was witness elimination); *Menendez v. State*,

---

**30.** Further, the Supreme Court of Florida has held in the past that a defendant's lack of remorse, although insufficient by itself, can be taken into consideration in determining whether a killing was "especially heinous, atrocious, or cruel." *Sireci v. State*, 399 So.2d 964, 971 (Fla.1981), *cert. denied*, 456 U.S. 984, 102 S.Ct.

2257, 72 L.Ed.2d 862 (1982). In 1983, however, the supreme court held that lack of remorse should no longer be considered as, or contributing to, an aggravating factor, because it is often difficult to ascertain. *Pope v. State*, 441 So.2d 1073, 1078 (Fla.1983).

368 So.2d 1278, 1282 (Fla.1979) ((5)(h) improper because "[a]lthough the victim's arms may have been in a submissive position at the time he was shot ... there is nothing to set his execution murder 'apart from the norm of capital felonies.' ").

 In this case, the facts clearly establish an execution-style murder of the kind the Supreme Court of Florida has said can be properly termed "especially heinous, atrocious, or cruel." When the victim, Jones, was unable to open the jammed cash register, petitioner fired two shots at him, one of which hit Jones in the chest. At that point, Jones, bleeding on the floor, had been rendered helpless. A significant amount of time then passed, during which petitioner walked behind the counter and unsuccessfully tried to open the register, successfully diverted the attention of a potential customer, and waited for that person to leave the store, get into a car, and drive away. Petitioner then walked to the front of the counter, and because he was aggravated and afraid of getting caught,[31] he shot Jones in the head.[32] The way in which this murder was committed can thus be described fairly as an execution of a victim, rendered helpless by the petitioner, for the purpose of witness elimination. This is a characterization of a murder "accompanied by such additional acts as to set the crime apart from the norm." *Cooper v. State*, 336 So.2d 1133, 1141 (Fla.1976) (per curiam) (citation omitted), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). We therefore find that the construction of (5)(h) given by the trial court and the Supreme Court of Florida "comports with the eighth amendment requirement that death sentences be based on clear, detailed, and rationally reviewable standards." *Proffitt*, 685 F.2d at 1263 (citing *Godfrey*, 446 U.S. at 427–33, 100 S.Ct. at 1764–67).[33]

The district court's denial of the writ of habeas corpus is

AFFIRMED.

---

**31.** *See supra* note 28.

**32.** Petitioner contends in his brief that this court should overturn any finding, implicit in the trial court's findings, that the victim was alive after the first shot to his chest. Although he advances this argument to combat any conclusion that the killing was torturous, we assume he also would advance it to combat a conclusion that the shot to the victim's head was an "execution." That Jones was alive after the first shot to his chest is implicit in the trial court's findings. This finding is one of fact and is presumed correct unless the petitioner can prove, by convincing evidence, that the factual determination of the court was erroneous. *See*

28 U.S.C. § 2254(d) (1982). We find that a determination that the victim was still alive after the first shot is completely consistent with the evidence presented and, therefore, will not disturb the trial court's findings.

**33.** In *Proffitt*, 685 F.2d at 1262 n. 54, we found a jury instruction identical to the one given here, *see supra* note 9, to limit insufficiently the jury's discretion. In this case, that error was rendered harmless by the trial court's findings, which explained why (5)(h) is applicable, and by the supreme court's review, which discussed the propriety of applying (5)(h) to the case.